# **<u>EXHIBIT A</u>**

| Morris County Recording Cover Sheet | MORRIS COUNTY, NJ |
|---|---|

**Morris County Recording Cover Sheet**

Honorable Ann F. Grossi, Esq.
Morris County Clerk

MORRIS COUNTY, NJ
Ann F. Grossi
DEED-OR BOOK 24849 PG 960
RECORDED 12/09/2024 15:31:55
FILE NUMBER 2024048691
RCPT # 1860551; RECD BY: ASICONOLFI eRecord
RECORDING FEES 110.00
TOTAL TAX 35,759.00
INDEX FEE

*Official Use Only - Realty Transfer Fee*

$13,209 ⁰⁰

*Official Use Only - Barcode*

| Date of Document: 2024-12-04 | Type of Document: DEED AND REALTY TAX FEES |
|---|---|
| First Party Name: William E. Grady | Second Party Name: Lisa A. McInerney |
| Additional Parties: Doreen Daly | |

| THE FOLLOWING SECTION IS REQUIRED FOR DEEDS ONLY | |
|---|---|
| Block: 12, | Lot: 8, |
| Municipality: HARDING TWP | |
| Consideration: 2255000.00 | |
| Mailing Address of Grantee: 30 Meyersville Road Green Village, NJ 07935 | |

| THE FOLLOWING SECTION IS FOR ORIGINAL MORTGAGE BOOK & PAGE INFORMATION FOR AN ASSIGNMENT, RELEASE, OR SATISFACTION OF A MORTGAGE OR AN AGREEMENT RESPECTING A MORTGAGE | |
|---|---|
| Original Book: | Original Page: |

**MORRIS COUNTY RECORDING COVER SHEET**
Please do not detach this page from the original document as it contains important recording information and is part of the permanent record.

WARNING: Information contained on the Recording Cover Sheet must exactly match the information within the attached document or the document will be rejected and returned.

This is not an official document

# DEED

Prepared by:

_Gregory J. Coffey, Esq._

Gregory J. Coffey, Esq.

This Deed is made on this 4th day of December, 2024.

**BETWEEN**

William E. Grady and Doreen Daly, husband and wife,

whose mailing address is 30 Meyersville Road, Green Village, New Jersey 07935,

referred to as the Grantor.

**AND**

Lisa A. McInerney, married,

whose address is about to be 30 Meyersville Road, Green Village, New Jersey 07935,

referred to as the Grantee.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

1.      **Transfer of Ownership.**  The Grantor grants and conveys (transfers ownership of) the property described below to the Grantee.  This transfer is made for the sum of **Two Million, Two Hundred Fifty Five Thousand and 00/100 ($2,255,000.00) Dollars.**  The Grantor acknowledges receipt of this money.

2.      **Tax Map Reference.**  (N.J.S.A. 46:15-2.1) Being known and designated as tax lot 8 in tax block 12 on the official tax map of the Township of Harding, County of Morris, State of New Jersey (30 Meyersville Road, Green Village, New Jersey 07935).

3.      **Property.**  The property consists of the land and all the buildings and structures on the land at 30 Meyersville Road, Green Village, New Jersey 07935.  Being the same land and premises that became vested in William E. Grady and Doreen Daly, husband and wife, as tenants in common and not as tenants by the entirety by Deed from William E. Grady and Doreen Daly, husband and wife, dated February 7, 2014, recorded February 18, 2014 in the Morris County Clerk/Register's Office in Deed-OR Book 22494, Page 1139.

Being the same land and premises that became vested in William E. Grady and Doreen Daly, husband and wife by Deed from Robert E. Blanchard and Clare N. Blanchard, husband and wife, dated January 27, 2014, recorded February 4, 2014 in the Morris County Clerk/Register's Office in Deed-OR Book 22490, Page 1410.

## EXHIBIT A
## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of Harding, in the County of Morris, State of New Jersey:

BEGINNING at a point and iron bar with cap found on the Northerly Right of Way line of Woodland Road (33.00 feet wide), said point being located a distance of 16.12 feet Westerly from the intersection of the aforesaid Northerly Right of Way line of Woodland Road with the Westerly Right of Way line of Meyersville Road (66.00 feet wide), said point also described in Deed Book 22494 Page 1139; thence running:

1) Along the aforesaid Northerly Right of Way line of Woodland Road, North 86 degrees 13 minutes 09 seconds West, a distance of 194.33 feet to a point and iron pipe found; thence

2) Continuing along the aforesaid Northerly Right of Way line of Woodland Road, North 88 degrees 34 minutes 55 seconds West, a distance of 330.79 feet to a point and iron bar with cap found; thence

3) North 00 degrees 58 minutes 00 seconds East, a distance of 457.61 feet to a point;

4) North 59 degrees 22 minutes 35 seconds East, a distance of 26.60 feet to a point; thence

5) South 49 degrees 02 minutes 35 seconds East, a distance of 117.71 feet to a point; thence

6) South 52 degrees 44 minutes 24 seconds East, a distance of 227.60 feet to a point and iron pipe with cap found; thence

7) South 69 degrees 24 minutes 24 seconds East, a distance of 345.94 feet to a point and iron bar found on the aforesaid Westerly Right of Way line of Meyersville Road; thence

8) Along the aforesaid Westerly Right of Way line of Meyersville Road, South 28 degrees 09 minutes 51 seconds West, a distance of 161.43 feet to a point and iron bar with cap found; thence

9) On a curve to the right, having a radius of 25.00 feet and an arc length of 28.63 feet to a point and iron bar with cap found on the aforesaid Northerly Right of Way line of Woodland Road, said point being the point and place of BEGINNING.

The above description being drawn in accordance with a survey prepared by Control Layouts, Inc. dated October 24, 2024.

FOR INFORMATION PURPOSES ONLY: BEING known as Tax Lot 8 in Tax Block 12 on the Official Tax Map of the Township of Harding, Morris County, State of NJ.

FOR INFORMATION PURPOSES ONLY: The mailing address is: 30 Meyersville Road, Green Village, NJ 07935.

GIT/REP-3
(8-24)
(Print or Type)

# State of New Jersey
## Seller's Residency Certification/Exemption

## Seller's Information

Name(s)
William E. Grady and Doreen Daly, husband and wife

Current Street Address
19 Damon Road

| City, Town, Post Office | State | ZIP Code |
|---|---|---|
| Scituate | MA | 02066 |

## Property Information

| Block(s) | Lot(s) | Qualifier |
|---|---|---|
| 12 | 8 | |

Street Address
30 Meyersville Road

| City, Town, Post Office | State | ZIP Code |
|---|---|---|
| Green Village | NJ | 07935 |

| Seller's Percentage of Ownership | Total Consideration | Owner's Share of Consideration | Closing Date |
|---|---|---|---|
| 100 | $2,255,000.00 | $2,255,000.00 | 12/9/2024 |

## Seller's Assurances (Check the Appropriate Box) (Boxes 2 through 16 apply to Residents and Nonresidents)

1. ☐ Seller is a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to the New Jersey Gross Income Tax Act, will file a resident Gross Income Tax return, and will pay any applicable taxes on any gain or income from the disposition of this property.

2. ☒ The real property sold or transferred is used exclusively as a principal residence as defined in 26 U.S. Code section 121.

3. ☐ Seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐ Seller, transferor, or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☐ Seller is not an individual, estate, or trust and is not required to make an estimated Gross Income Tax payment.

6. ☐ The total consideration for the property is $1,000 or less so the seller is not required to make an estimated Income Tax payment.

7a. ☐ The gain from the sale is not recognized for federal income tax purposes under 26 U.S. Code section 721, 1031, or 1033 (CIRCLE THE APPLICABLE CODE SECTION). If the indicated section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey Income Tax return for the year of the sale and report the recognized gain. See instructions.

7b. ☐ Seller **only** received like-kind property.

8. ☐ The real property is being transferred by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this State.

9. ☐ The real property being sold is subject to a short sale instituted by the mortgagee, whereby the seller agreed not to receive any proceeds from the sale and the mortgagee will receive all proceeds paying off an agreed amount of the mortgage.

10. ☐ The deed is dated prior to August 1, 2004, and was not previously recorded.

11. ☐ The real property is being transferred under a relocation company transaction where a trustee of the relocation company buys the property from the seller and then sells the house to a third party buyer for the same price.

12. ☐ The real property is being transferred between spouses or incident to a divorce decree or property settlement agreement under 26 U.S. Code section 1041.

13. ☐ The property transferred is a cemetery plot.

14. ☐ The seller is not receiving net proceeds from the sale. Net proceeds from the sale means the net amount due to the seller on the settlement sheet.

15. ☐ The seller is a retirement trust that received an acknowledgment letter from the Internal Revenue Service that the seller is a retirement trust, and is therefore not required to make the estimated Gross Income Tax payment.

16. ☐ The seller (and/or spouse/civil union partner) originally purchased the property while a resident of New Jersey as a member of the U.S. Armed Forces and is now selling the property as a result of being deployed on active duty outside of New Jersey. (Only check this box if applicable and neither boxes 1 nor 2 apply.)

## Seller's Declaration

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein may be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete. By checking this box ☐ I certify that a Power of Attorney to represent the seller(s) has been previously recorded or is being recorded simultaneously with the deed to which this form is attached.

| | |
|---|---|
| 12/04/24 | _signature_ |
| Date | Signature (Seller)    Indicate if Power of Attorney or Attorney in Fact |
| 12/04/24 | _signature_ |
| Date | Signature (Seller)    Indicate if Power of Attorney or Attorney in Fact |

RTF-1 (Rev. 3/2/22)
MUST SUBMIT IN DUPLICATE

STATE OF NEW JERSEY
**AFFIDAVIT OF CONSIDERATION FOR USE BY SELLER**
(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) (N.J.S.A. 46:15-5 et seq.)
BEFORE COMPLETING THIS AFFIDAVIT, PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM.

STATE OF NEW JERSEY

COUNTY ___Morris___ }SS. County Municipal Code ___1413___

| | FOR RECORDER'S USE ONLY |
|---|---|
| | Consideration $ 2,255,000.00 |
| | RTF paid by seller $ 13,209.00 |
| | Date 4/9/20  By AJ |

*Use symbol "C" to indicate that fee is exclusively for county use.

MUNICIPALITY OF PROPERTY LOCATION ___Harding Township___

(1) **PARTY OR LEGAL REPRESENTATIVE** (See Instructions #3 and #4 on reverse side)

Deponent, ___William E. Grady___, being duly sworn according to law upon his/her oath,
(Name)
deposes and says that he/she is the Grantor ___ in a deed dated ___December 4, 2024___ transferring
(Grantor, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)

real property identified as Block number ___12___ Lot number ___8___ located at

___30 Meyersville Road, Green Village___ and annexed thereto.
(Street Address, Town)

(2) **CONSIDERATION** $ 2,255,000.00 (Instructions #1 and #5 on reverse side) ☐no prior mortgage to which property is subject.

(3) Property transferred is Class 4A  4B  4C (circle one). If property transferred is Class 4A, calculation in Section 3A below is required.

(3A) REQUIRED CALCULATION OF EQUALIZED VALUATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS:
(See Instructions #5A and #7 on reverse side)
Total Assessed Valuation + Director's Ratio = Equalized Assessed Valuation

$ _____ ÷ _____ % = $ _____

If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed value. If Director's Ratio is equal to or in excess of 100%, the assessed value will be equal to the equalized valuation.

(4) **FULL EXEMPTION FROM FEE** (See Instruction #8 on reverse side)
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through C. 66, P.L. 2004, for the following reason(s). More reference to exemption symbol is insufficient. Explain in detail.
_____

(5) **PARTIAL EXEMPTION FROM FEE** (Instruction #9 on reverse side)
NOTE: All boxes below apply to grantor(s) only. ALL BOXES IN APPROPRIATE CATEGORY MUST BE CHECKED. Failure to do so will void claim for partial exemption. Deponent claims that this deed transaction is exempt from State portions of the Basic, Supplemental, and General Purpose Fees, as applicable, imposed by C. 176, P.L. 1975, C. 113, P.L.2004, and C. 66, P.L. 2004 for the following reason(s):

A.  SENIOR CITIZEN     Grantor(s) ☑ 62 years of age or over. *   ( Instruction #9 on reverse side for A or B)
B.  BLIND PERSON       Grantor(s) ☐ legally blind or; *
    DISABLED PERSON    Grantor(s) ☐ permanently and totally disabled ☐ receiving disability payments ☐ not gainfully employed*

Senior citizens, blind persons, or disabled persons must also meet all of the following criteria:
☑ Owned and occupied by grantor(s) at time of sale.    ☑ Resident of State of New Jersey.
☐ One or two-family residential premises.              ☐ Owners as joint tenants must all qualify.

*IN CASE OF HUSBAND AND WIFE, PARTNERS IN A CIVIL UNION COUPLE, ONLY ONE GRANTOR NEED QUALIFY IF TENANTS BY THE ENTIRETY.

C.  LOW AND MODERATE INCOME HOUSING (Instruction #9 on reverse side) IF APPLIES ALL BOXES MUST BE CHECKED.
    ☐ Affordable according to H.U.D. standards.        ☐ Reserved for occupancy.
    ☐ Meets income requirements of region.             ☐ Subject to resale controls.

(6) **NEW CONSTRUCTION** (Instructions #2, #10 and #12 on reverse side) IF APPLIES ALL BOXES MUST BE CHECKED.
    ☐ Entirely new improvement                         ☐ Not previously occupied.
    ☐ Not previously used for any purpose.             ☐ "NEW CONSTRUCTION" printed clearly at top of first page of the deed.

(7) **RELATED LEGAL ENTITIES** (Instructions #5, #12, #14 on reverse side) IF APPLIES ALL BOXES MUST BE CHECKED.
    ☐ No prior mortgage assumed or to which property is subject at time of sale.
    ☐ No contributions to capital by either grantor or grantee legal entity.
    ☐ No stock or money exchanged by or between grantor and grantee legal entities.

(8) **INTERCOMPANY TRANSFER** IF APPLIES ALL BOXES MUST BE CHECKED. (Instruction #15 on reverse side)
    ☐ Intercompany transfer between combined group members as part of the unitary business
    ☐ Combined group NU ID number (Required) _____

(9) Deponent makes this Affidavit to induce county clerk or register of deeds to record the deed and accept the fee submitted herewith in accordance with the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this ___4th___ day of ___December___ 20 ___24___

___Donna J. Flannery___

Donna J Flannery
NOTARY PUBLIC
State of New Jersey
ID # 50070574
My Commission Expires 10/26/2027

_____(Signature of Deponent)_____   ___William E. Grady___
30 Meyersville Rd., Green               Grantor Name
Vill, NJ 07935                          30 Meyersville Rd., Green
Deponent Address                        Vill, NJ 07935
                                        Grantor Address at Time of Sale

___XXX-XX-X 583___                      ___Hilltop Title, LLC___
Last three digits in Grantor's Social Security Number    Name/Company of Settlement Officer

| | FOR OFFICIAL USE ONLY  County |
|---|---|
| Instrument Number 2-02404 8691 | Morris |
| Deed Number _____ | Book 24849 Page 960 |
| Deed Dated 12/4/24 | Date Recorded 12/9/24 |

County recording officers shall forward one copy of each RTF-1 form when Section 3A is completed to:
STATE OF NEW JERSEY
PO BOX 251
TRENTON, NJ 08695-0251
ATTENTION: REALTY TRANSFER FEE UNIT

The Director of the Division of Taxation in the Department of the Treasury has prescribed this form as required by law, and may not be altered or amended without prior approval of the Director. For information on the Realty Transfer Fee or to print a copy of this Affidavit, visit the Division of Taxation website at:
https://www.state.nj.us/treasury/taxation/lpt/localtax.shtml

Book24849/Page964

RTF-1EE (Rev. 3/2/22)
MUST SUBMIT IN DUPLICATE

**STATE OF NEW JERSEY**
**AFFIDAVIT OF CONSIDERATION FOR USE BY BUYER**
(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) (N.J.S.A. 46:15-5 et seq.)
**PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM BEFORE COMPLETING THIS AFFIDAVIT.**

STATE OF NEW JERSEY
} SS.
COUNTY    MORRIS

County Municipal Code
1413

| FOR RECORDER'S USE ONLY |
|---|
| Consideration        $ 2,255,000.00 |
| RTF paid by Buyer   $ 22,550.00 |
| Date  12/9/24        By          AJ |

MUNICIPALITY OF PROPERTY LOCATION  **Township of Harding**

(1) PARTY OR LEGAL REPRESENTATIVE (See Instructions #3 and #4 on reverse side)    XXX-XX-X  443
Last three digits in grantee's Social Security Number

Deponent, _____ Lisa A. McInerney _____ being duly sworn according to law upon his/her oath,

deposes and says that he/she is the ____ Grantee ____ in a deed dated December 4, 2024 transferring
(Grantee, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)

real property identified as Block number _____ 12 _____ Lot number _____ 8 _____ located at

_____ 30 Meyersville Road, Green Village _____ and annexed thereto.
(Street Address, Town)

(2) CONSIDERATION _____ $2,255,000.00 _____ (See Instructions #1, #5 and #11 on reverse side)
Entire consideration is in excess of $1,000,000.

PROPERTY CLASSIFICATION CHECKED OR CIRCLED BELOW IS TAKEN FROM THE OFFICIAL ASSESSMENT LIST (A PUBLIC RECORD)
OF THE MUNICIPALITY WHERE THE REAL PROPERTY IS LOCATED IN THE YEAR OF TRANSFER. REFER TO N.J.A.C. 18:12-2.2 ET SEQ.
(A) When Grantee is required to remit the 1% fee, complete (a) by checking off appropriate box or boxes below.

- X  Class 2 – Residential
- ☐  Class 3A- Farm property (Regular) and any other real
property transferred to same grantee in conjunction
with transfer of Class 3A property
- ☐  Class 4A – Commercial Properties
(If checked, calculation in (E) required below)
- ☐  Cooperative unit (four families or less) (See C. 46:8D-3.)
Cooperative units are Class 4C.

(B) Grantee is **not** required to remit 1% fee (one or more of following classes being conveyed), complete (B) by checking off
appropriate box or boxes below:
- ☐  Property Class. Circle applicable class or classes:        1        3B        4B        4C        15
Property classes: 1-Vacant Land; 3B Farm property (Qualified); 4B-Industrial properties; 4C-Apartments; 15 Public Property, etc. (N.J.A.C. 18:12-2.2 et seq.)
- ☐  Exempt Organization determined by federal Internal Revenue Service/Internal Revenue Code of 1986, 26 U.S.C. s. 501.
- ☐  Incidental to corporate merger or acquisition; equalized assessed valuation less than 20% of total value of all assets
exchanged in merger or acquisition. If checked, calculation in (E) required and **MUST ATTACH COMPLETED RTF-4.**
- ☐  Intercompany transfer between combined group members as part of the unitary business (See Instruction #13 on reverse side)
List the Combined group NU ID number (Required) _____

(C) When grantee transfers properties involving block(s) and lot(s) of two or more classes in one deed, one or more subject to the
1% fee (A), with one or more than one class subject to N.J.S.A 46:15-7.2, complete (C) by checking off
appropriate box or boxes and (D).
- ☐  Property class. Circle applicable class or classes:        1        2        3B        4A        4B        4C        15

(D) EQUALIZED VALUE CALCULATION FOR ALL PROPERTIES CONVEYED, WHETHER THE 1% FEE APPLIES OR DOES NOT APPLY
Total Assessed Valuation ÷ Director's Ratio = Equalized Valuation

| | | | | | |
|---|---|---|---|---|---|
| Property Class  2 | $1,051,700.00 | ÷ | 85.79 | % = $ | 1,225,900.45 |
| Property Class ____ | $ | ÷ | | % = $ | |
| Property Class ____ | $ | ÷ | | % = $ | |
| Property Class ____ | $ | ÷ | | % = $ | |

(E) REQUIRED EQUALIZED VALUE CALCUATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS: (See Instructions #6 and #7 on
reverse side)
Total Assessed Valuation ÷ Director's Ratio = Equalized Assessed Valuation
$ _____ ÷ _____ % = $ _____
If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed valuation. If Director's Ratio is equal
to or exceeds100%, the assessed valuation will be equal to the equalized value.

(3) TOTAL EXEMPTION FROM FEE (See Instruction #8 on reverse side)
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through Chapter 33, P.L. 2006,
for the following reason(s). Mere reference to exemption symbol is insufficient. Explain in detail.
_____

(4) Deponent makes Affidavit of Consideration for Use by Buyer to induce county clerk or register of deeds to record the deed and accept the fee submitted
herewith pursuant to the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this ____ day of _____ 2024

_____
Signature of Deponent
30 Meyersville Road, Green Village, NJ 07936
Deponent Address

Lisa A. McInerney
Grantee Name
30 Meyersville Road, Green Village, NJ 07935
Grantee Address at Time of Sale
Hilltop Title, LLC.
Name/Company of Settlement Officer

MARIANNE SAKS
Commission # 2314221
Notary Public, State of New Jersey
My Commission Expires
May 15, 2029

County recording officers: forward one copy of each RTF-1EE to:
STATE OF NJ - DIVISION OF TAXATION
PO BOX 251
TRENTON, NJ 08695-0251
ATTENTION: REALTY TRANSFER FEE UNIT

| FOR OFFICIAL USE ONLY |
|---|
| 2024048691        Morris County |
| Instrument Number        County |
| Deed Number        Book 24849 Page 960 |
| Deed Dated 12/4/24        Date Recorded 12/9/24 |

The Director, Division of Taxation, Department of the Treasury has prescribed this form, as required by law. It may not be altered or amended without prior
approval of the Director. For further information on the Realty Transfer Fee or to print a copy of this Affidavit or any other relevant forms, visit:
www.state.nj.us/treasury/taxation/ptlocaltax.shtml.

The legal description is:

**See Legal Description attached hereto.**

[X]  Please see attached Revised Legal Description and New Jersey Survey Endorsement (NJRB 5-01) dated October 25, 2024 annexed hereto and made a part hereof (Check box if applicable).

SUBJECT to easements, restrictions of record and such state of facts as an accurate survey may disclose.

The street address of the Property is:   30 Meyersville Road, Green Village, New Jersey 07935.

4.   **Promises by Grantor.**  The Grantor promises that the Grantor has done no act to encumber the property.  This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

**Signatures.**  The Grantor signs this Deed as of the date at the top of the first page.

Witnessed by:

_____     _____ (Seal)
                                     By:  William E. Grady

Witnessed by:

_____     _____ (Seal)
                                     By:  Doreen Daly

STATE OF NEW JERSEY, COUNTY OF MORRIS                    SS:
I CERTIFY that on December _4 TH_, 2024,

William E. Grady and Doreen Daly, husband and wife, personally came before me and acknowledges under oath, to my satisfaction, that this person (or if more than one, each person):

(a)   is named in and personally signed this Deed;
(b)   signed, sealed and delivered this Deed as his or her act and deed; and
(c)   made this deed for $2,255,000.00 as the full and actual consideration paid or to be paid for the transfer of title.  (Such consideration is defined in N.J.S.A. 46:15-5).

Signed and sworn to before me on December 4, 2024

_____
Notary Public

Donna J Flannery
NOTARY PUBLIC
State of New Jersey
ID # 50070574
My Commission Expires 10/26/2027

# DEED

BY

William E. Grady and Doreen Daly,
husband and wife,

        Grantor,

TO

Lisa A. McInerney, married,

        Grantee.

Dated: December 4, 2024

Record and Return to:

Hilltop Title, LLC
8 East Main Street
Mendham, NJ 07945

# **EXHIBIT B**

**BRACH EICHLER L.L.C.**

Keith J. Roberts, Esq (043681993)

Thomas Kamvosoulis, Esq. (020132004)

Paul J. DeMartino, Jr., Esq. (167912016)

101 Eisenhower Parkway

Roseland, New Jersey 07068-1067

(973) 228-5700

*Attorneys for Plaintiffs*

**FILED: May 5, 2022**

| | |
|---|---|
| ANTHONY FESTA, M.D., ANTHONY SCILLIA, M.D., CRAIG WRIGHT, M.D., JOHN CALLAGHAN, M.D., AND CASEY PIERCE, M.D.<br><br>          Plaintiffs,<br><br>v.<br><br>VINCENT MCINERNEY, M.D., NEW JERSEY ORTHOPAEDIC INSTITUTE LLC, and NORTHLANDS ORTHOPAEDIC INSTITUTE LLC<br><br>          Defendants. | SUPERIOR COURT OF NEW JERSEY<br>PASSAIC COUNTY<br>CHANCERY DIVISION<br><br>DOCKET NO.:  PAS-C-5-22<br><br>Civil Action<br><br>ORDER |

      **THIS MATTER** having come before the Court upon the application of Frier Levitt LLC attorneys for Defendants Vincent McInerney, M.D., New Jersey Orthopaedic Institute LLC, and Northlands Orthopaedic Institute LLC ("Defendants") for a Motion to Compel Arbitration ("Motion to Compel Arbitration") and by way of a cross-motion filed by Brach Eichler LLC attorneys for Plaintiffs Anthony Festa, M.D., Anthony Scillia, M.D., Craig Wright, M.D., John Callaghan, M.D., and Casey Pierce, M.D. ("Plaintiffs") for entry of an Order to Compel Defendants to place Plaintiffs' End of Year 2021 Distributions into Escrow ("Motion to Escrow"); and the Court having considered the moving papers, the submissions of the parties, the arguments of counsel, and for good cause shown:

      **IT IS** on this 5th day of May 2022, **ORDERED**, as follows:

1.      This Order effectuates the oral decision made on the record by the Court on May 2, 2022 on the Motion to Compel Arbitration and Motion to Escrow, which decision is incorporated herein by reference.

2.      Defendants' Motion to Compel Arbitration is hereby **GRANTED,** and Plaintiffs' Complaint is dismissed.

3.      Plaintiffs' Motion to Escrow is hereby **GRANTED.**

4.      Defendants shall place $1,750,000.00 into escrow during the pendency of the litigation and, more specifically, into the attorney trust account of Frier Levitt LLC by no later than the close of business on Monday May 9, 2022; which escrow is to secure the Plaintiff's claim to an entitlement to end of year 2021 distributions.

5.      Defendants' counsel shall provide Plaintiffs' counsel with written confirmation of the wire transfer or any other method of payment made by Defendants documenting that Defendants have transferred the $1,750,000.00 amount into the Frier Levitt attorney trust account within 24 hours of said transfer.

6.      A copy of this Order shall be served upon all counsel within 5 days hereof.


_/s/ Randal C. Chiocca_____
Hon. Randal Chiocca, P.J.Ch.


Opposed _xx_____

Unopposed_____

BE:12543304.1/ACA028-281497

# **EXHIBIT C**

## AMERICAN HEALTH LAW ASSOCIATION

| | | |
|---|---|---|
| ANTHONY FESTA, M.D., ANTHONY | : | |
| SCILLIA, M.D., CRAIG WRIGHT, M.D., | : | |
| JOHN CALLAGHAN, M.D., CASEY | : | |
| PIERCE, M.D., and ACADEMY | : | |
| ORTHOPAEDICS LLC | : | |
| | : | |
| Claimants, | : | |
| v. | : | Case no. 7150 |
| | : | |
| VINCENT MCINERNEY, M.D., NEW | : | |
| JERSEY ORTHOPAEDIC INSTITUTE LLC | : | |
| and NORTHLANDS ORTHOPAEDIC | : | |
| INSTITUTE LLC, | : | |
| | : | |
| Respondents. | : | |

## DECISION OF THE ARBITRATOR

A. Background

The disputes presented in this matter involving New Jersey Orthopaedic Institute LLC and
Northlands Orthopaedic Institute LLC (collectively the "Practice"), though unique, are reminiscent
of many disputes I have seen over the years between junior and senior partners in professional
practices of all kinds, be they accounting, dental, medical, or law.

Dr. McInerney, a highly respected orthopedic surgeon with a storied career, founded the
Practice. Over time Drs. Festa, Scillia, Wright, Callaghan, and Pierce (the "Physician Claimants")
joined the Practice. By all accounts Dr. McInerney was very reasonable, if not generous, in
agreeing to the terms on which the Physician Claimants joined the Practice. No true "buy-in" was
required. The Physician Claimants and Dr. McInerney were all equal owners and were
compensated alike. Furthermore, and most significantly, the agreements governing the Practice
entities (the "Operating Agreements") did not contain post-departure nonsolicitation or
noncompetition covenants (collectively, "Restraints"). Thus, the Physician Claimants were not
prohibited from resigning from the Practice and competing with it.

Although the relationship among the doctors was initially warm and amiable, over time friction developed between Dr. McInerney and the Physician Claimants. Dr. McInerney began to see the Physician Claimants as ungrateful for the mentoring and opportunities he had afforded them, and they began to see him as entitled, insensitive to their needs, and unappreciative of the skill and reputations that they had developed.

The relationship worsened and in August 2021, the Physician Claimants gave notice that they were going to leave the Practice. They did so on January 1, 2022, opening Academy Orthopaedics, LLC ("AOG"), in the same building and on the same floor as the Practice. Since the doctors had trouble getting along when they were partners in a medical practice having a common goal, it was almost inevitable that tempers would flare and the relationship would turn hostile after the Physician Claimants gave their notice and left. Prior to the filing of this arbitration this matter was pending in the New Jersey Superior Court, Chancery Division, Passaic County. Claimants filed their arbitration complaint in response to Respondents' motion to compel arbitration, which was granted[1].

Respondents characterize the Physician Claimants' departure as a premeditated, cruel, and spiteful conspiracy to destroy the Practice. Consistent with that characterization they instructed their expert to compute damages by comparing the value of Dr. McInerney's interest in the Practice before the Physician Claimants left to the value of his interest after they left. This analysis assumes that the departure itself was wrongful and does not take into account that the Physician Claimants were not bound by Restraints. I do not think the evidence presented supports the Respondents' position in this regard. The Physician Claimants simply decided to leave the Practice and go out

---

[1] In granting Respondents' motion to compel arbitration, the court entered an order requiring Respondents to escrow $1.75 million to secure Claimants' claim to an entitlement to their end of year 2021 distribution.

on their own – as Dr. McInerney invited them to do at a meeting on July 28, 2021. Even if the Physician Claimants had complied with all of their contractual, fiduciary, and other obligations in leaving the Practice, I believe that Dr McInerney's interest in the Practice would nevertheless have declined significantly.[2]

The departing Physician Claimants did <u>not</u> comply with all such obligations. I will discuss their transgressions in my analysis of the Respondents' counterclaims, <u>infra</u>. However, despite their wrongdoing, they did have the right to leave the Practice and compete – even next door.

B.  <u>Claimants' Statement of Claims</u>. However characterized or described, Claimants' claims are essentially the following:

1.    <u>Failure to Pay EOY 2021 Distributions</u>.   Section 5.2(a) of the Operating Agreements provide that "the Company shall distribute the Net Cash Flow to the Members in proportion to their respective Percentage Interests." The Operating Agreements do not specify <u>when</u> Net Cash Flow is to be distributed.  However, New Jersey's Revised Uniform Limited Liability Company Act abandoned the previous LLC act requirement that operating agreements be written, specifically authorizing oral or implied agreements. I believe the members' course of dealing is evidence of an oral agreement that distributions be made quarterly, and the Physician Claimants (and Dr. McInerney) were entitled to a fourth quarter 2021 distribution.

How large should this fourth quarter distribution have been? Claimants' expert opined that it should have been approximately $600,000 per member. However, he based his opinion on the 2021 taxable income of the Practice, and the ratio in past years of distributions to taxable income.

---

[2] The Respondents' expert analyzed their damages on two alternative bases, as he was instructed to do by Respondents' counsel. One was disgorgement of compensation paid from August 17, 2021, through December 31, 2021. The second was lost profits attributed to the Physician Claimants leaving and was not tied to any specific wrongful acts the Physician Claimants are alleged to have committed. I see no justification for the computation of damages on either of these two bases.

I do not think that this ratio is an important factor in determining the size of distributions. Key here, I think, is the contractual definition of "Net Cash Flow" which requires a holdback "to maintain reasonable reserves and working capital." I also do not accord much weight to Claimants' arguments that the Practice did not suffer cash flow issues after the Physician Claimants left. What constitutes reasonable working capital and reserves is not an issue to be examined in the rear-view mirror; what is important is what size reserves would have been deemed reasonable by the Practice at that time.

Dr. McInerney's decision not to make any fourth quarter distribution was unreasonable and should not be afforded the presumption of the business judgment rule - it strikes me as not so much a good faith reasoned conclusion as a knee-jerk decision not to fund a lawsuit against him. The nearest thing to a reasoned analysis is the recommendation of the Practice's accountant, Walter Loeffler, made in consultation with the Practice, that the fourth quarter distribution be $250,000 per member, and I rule that that is the amount that should have been paid to each member.

2.    <u>Buyout Value of Physician Claimants' Interest in the Practice</u>.  Section 7.7 of the Operating Agreements mandate that the Practice purchase a withdrawing member's interest in the Practice per a formula set forth therein.  The Claimants' expert valued each Physician Claimant's interest in the Practice as having a negative value.  However, his opinion assumed all of the cash on hand would be paid out as distributions. If, instead, only $250,000 per member, equaling $1,500,000 in the aggregate, were paid out, the value of each Physician Claimant's interest in the Practice would be $248,500. Because between ninety (90) days and six months' notice of the Physician Claimants' departure was given, a twenty (20%) percent discount must be applied to this value, yielding $215,000[3] per Physician Claimant.

---

[3] The adjusted book value of the assets would be increased by the amount of the cash that would remain in the Practice (<u>i.e.</u>, $3,850,000 less $1,500,000). See Figure 10 in the Claimants' experts' report.

4

Per the Operating Agreements, this amount is payable over time, with interest, and subject to certain payment caps. These will be discussed <u>infra</u>.

3.    <u>Payment to Physician Claimants under the Deferred Compensation Agreements</u>. The Practice entered into deferred compensation agreements (the "Deferred Compensation Agreements") with each of the Physician Claimants when they became members.   These agreements provide that a member who voluntarily withdraws is entitled to deferred compensation. The amount of this deferred compensation is based on the withdrawing member's percentage ownership (here 16.67% for each Physician Claimant) multiplied by the Practice's accounts receivable, adjusted for collectability.

The Deferred Compensation Agreements contain a formula for adjusting the Practice's accounts receivable for collectability.  I believe that this formula is reasonable, clearly explicated, and objective (that is, the party applying the formula need make no subjective decisions as to what receivables are "good").  The Respondents did not make a convincing argument that either (a) the Claimant's expert incorrectly applied this formula, or (b) the result obtained by the formula's application was so flawed that it should be reformed.   I believe that the calculations in the Claimants' expert's report are correct, and that the Physician Claimants should be paid deferred compensation of $4,925,000 in the aggregate.

Per the Deferred Compensation Agreements, this amount is payable over time, with interest, and subject to certain payment caps. These will be discussed <u>infra</u>.

4.    <u>Payment to Physicians of BAIT Tax Reimbursement</u>. New Jersey enacted the Business Alternative Income Tax ("BAIT") to circumvent the state and local tax deduction limitation of $10,000 per year that was enacted at the federal level. The underlying facts of this dispute are too complicated to set forth here, but essentially in February 2022 the Practice received a tax refund of $1,062,224, representing a refund of moneys paid by the members of the Practice

in prior years. The Practice has a fiduciary duty to pay the Physician Claimants their share of this refund, or $885,000 in the aggregate. It would be inappropriate to treat the right to this refund as an ordinary trade receivable.

5.    <u>Claim for Reimbursement of Expenses Paid by Dr. Scillia Personally</u>. In some ways the Claimants were restrained in their demands for damages in this arbitration. For example, they could have argued (albeit futilely) that no discounts should be applied for giving less than six months' notice of withdrawal because the Physician Claimants' early departure was caused by the wrongful acts of the Respondents. By way of further example, they (rightfully) had their expert reduce his damage calculation by the Practice's negative adjusted book value even though the Operating Agreements did not expressly require him to do so. I applaud the Claimants for this restraint.

This claim, however, strikes me as being a little greedy. Section 15.2 of the Operating Agreements provides each member with a discretionary expense allowance of $25,000 a year. During 2021 Dr. Scillia was reimbursed more than $25,000. I will not require the Practice to reimburse him for additional expenses that he requested as he was walking out the door.

C.    <u>Respondents' Counterclaims</u>. Respondents' counterclaims are set forth in nine counts, including breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, tortious interference with economic advantage, common law misappropriation of trade secrets, and violation of the New Jersey Trade Secrets Act. The Respondents have alleged the following and asserted that each constitutes a wrongful act coming under the aegis of multiple counts.

1.    <u>Lease of Space at 504 Valley Road</u>. Respondents find fault in the Physician Claimants looking for office space while still members of the Practice, keeping their office search secret, and opening their office so close to the Practice.

I find that the Physician Claimants did nothing wrong in searching for office space and signing a lease while still members of the Practice. There is a difference between preparing to compete and actually competing. The former is permissible, the latter not. Finding space and signing a lease are preparing to compete and are permitted. I also find that the Physician Claimants were not under any legal duty to inform the Practice of their plans.

Leasing space across the hall from the Practice could be viewed as an act of vindictiveness or a dirty deed. However, the Physician Claimants testified that they leased this space not because of its location but rather because it had been a medical office, required little fit up, and could be available quickly. I find this testimony to be credible and no evidence was offered to refute it. Importantly, there were no Restraints prohibiting the Physician Claimants from opening an office within any specific distance from the Practice.

2.    <u>Early Departure</u>. The Respondents claim they were damaged by the Physician Claimants leaving the Practice a month and a half sooner than the date set forth in their August resignation letters. The Operating Agreements and the Deferred Compensation Agreements provide that benefits thereunder will be discounted twenty (20%) percent if between ninety (90) days' and six months' notice is provided and more than twenty (20%) percent if the notice provided is less than 90 days. If these provisions are construed to mean <u>notice of departure</u>, then the Physician Claimants clearly gave four and a half months' notice and the discount provided should be twenty (20%) percent. If these provisions are construed to mean <u>notice of the date of departure</u>, then the Respondents can argue that less than ninety (90) days' notice was given, since there is no written evidence that a December 31 date of departure was specified until well into October.

I am wary of the <u>notice of departure</u> interpretation of the agreements because it would create an incentive for all departing members to give six months' notice and thereafter resign whenever it suited them. Even accepting the <u>notice of the date of departure</u> interpretation,

however, I do not think that more than a twenty (20%) percent discount should be applied.  I believe that the Respondents knew that there was a reasonable expectation that the Physician Claimants would be leaving the Practice before February 15, 2022, more than ninety (90) days before they actually left, even though the date of departure had not been specified with certainty.[4] Disputes had arisen regarding the scheduling of patients and the handling of inquiries, and it was clear that the separation was not proceeding smoothly.

3.    <u>Dr. Thomas Novack</u>. Dr. Novack signed an employment contract to begin working for the Practice on September 1, 2021.  However, in August to 2021 Dr. Pierce called Dr. Novack to inform him of the Physician Claimants' imminent departure from the Practice.  Of note, Dr. McInerney testified that he entered into an agreement with Dr. Novack's employer and agreed to release Dr. Novack from his contract.  Thus, it would not be appropriate to award the Practice damages.[5]

4.    <u>Solicitation of University Spine Center and Schools</u>. The Practice had business relationships with University Spine Center ("USC") and a number of schools and sports teams with which it contracted to provide physician services.  Following the departure of the Physician Claimants, USC and many of these schools and sports team contracted with AOG.  After the Physician Claimants gave notice but before they left the Practice, Dr. McInerney had an opportunity to contact USC and these schools and sports team, cement his relationship with them, and seek to insure that they would continue to utilize the Practice's services after the Physician Claimants left.  That is surely one of the benefits the advance withdrawal notice requirement in

---

[4] Although not entirely analogous, I note that under the Warn Act an employer must give a Warn Act notice even if laying off fewer than 90 employees if there is a reasonable expectation that additional employees will be laid off in the future, bringing the total number of employees laid off to more than 90.

[5] If it were appropriate to award the Practice damages, I would be hard pressed to fix them, since no evidence was proffered in this regard.

the Operating Agreements was intended to provide the Practice.  As noted earlier and repeatedly, the Physician Claimants were not bound by Restraints.  If the Practice was not able to retain its relationships with these schools and sports teams, many of which were of many years' standing, the Claimants are not to blame.

Importantly, Respondents did not provide testimony from anyone at USC or any school or sports team to support the assertion that the Claimants solicited their business before December 31, 2021, slandered or libeled Dr. McInerney, or interfered with the Practice's contractual arrangements with them.

5.     "Mass Download" and HIPPAA Violations. In December 2021, unable to inform the patients they had treated of their impending departure, the Physician Claimants resorted to what they called "self-help" to obtain surreptitiously the contact information of such patients from the Practice's EMR system.

The Claimants' counsel argues the Physician Claimants had the legal obligation to notify the patients they had seen of their impending departure.  The Board of Medical Examiner regulations they cite ostensibly deal more with abandonment issues than a physician leaving a practice.  Here, five out of six of the Practice's surgeons left the Practice, and the Practice lost its ability to perform some types of surgeries it had done in the past. This could easily be construed as situation akin to abandonment requiring the giving of notice under these regulations.  In truth, the Practice no longer had the ability to provide continuity of care for a majority of its patients.

Whether or not the Practice and the Physician Claimants had the legal obligation to inform such patients of the Physician Claimants' impending departure, they surely had an ethical and moral obligation.  It would be outrageous, for example, if a patient on whom one of the Physician Claimants had operated called the Practice after January 1, 2022, to report a post-operative problem, only to be told that their doctor was no longer there. Dr. McInerney was withholding this

9

patient information, apparently as leverage in his attempt to negotiate a number of issues regarding the split. I understand why the Physician Claimants felt like they needed this information.

Respondents allege that this so-called "mass download" violated HIPPAA and undercut the measures that the Practice had taken to protect patient data (e.g., protective IT access architecture, employee training, etc.). I do not think that this access violated HIPPAA and, in any event, any cause of action would reside in the patients, not the Practice. Furthermore, the Practice has not provided any evidence that it suffered damages as a result of any such alleged HIPPAA violation.

6.     <u>Unauthorized Patient Letter</u>. In November 2021, Claimants through counsel submitted to the Practice a proposed letter to be sent to patients seen by the Physician Claimants notifying them of the departure of the Physician Claimants. Although it would not have been inappropriate for the Respondents to request certain changes to the letter (e.g., deletion of the reference to a "seamless transition"), the letter was well crafted and appropriate. The Practice did not agree to send the letter or suggest changes to it, again apparently as leverage in Dr. McInerney's attempt to negotiate a number of issues regarding the split. When the Physician Claimants were able to obtain the names and addresses of the patients they had seen in a format that would enable a mailing to be made, they modified the November letter their counsel had prepared. The revised letter, which they mailed in January after they left the Practice, was confusing to say the least. It was on AOG letterhead, but ostensibly signed by NJOI. And Dr. Scillia, who was no longer a member, manager, officer, or employee of NJOI, improperly signed the letter on behalf of NJOI.

Because the letter that AOG mailed was so flawed, the New Jersey Superior Court, Chancery Division, Passaic County, authorized and directed the mailing of a corrective letter, which was done. Although the letter that AOG mailed was flawed, the corrective letter surely

ameliorated some of the confusion that it caused, and no evidence was proffered quantifying any

damages that the Practice sustained as a result of its mailing.

Even if there had been Operating Agreement provisions prohibiting the soliciting of the

Practice's patients, it is unlikely the Respondents could show that they were entitled to damages

flowing from AOG's mailing of the patient letter.  For one thing, Restraints can only be enforced

if they are not contrary to the public interest.  In this instance, prohibiting the patients of the

Physician Claimants from knowing how to contract their doctor would have had a disastrous effect

on their continuity of care and therefore be contrary to the public interest. Furthermore, the

Respondents would have difficulty proving damages. Would a patient a Physician Claimant had

operated on, or who had scheduled an operation by a Physician Claimant, be willing to be seen by

another doctor they had never met?  And with five of its six surgeons having left, how many of

these patients could the Practice have handled?  No evidence whatsoever was offered to quantify

the damages allegedly caused by the mailing of AOG's patient letter.

I also hold that AOG's mailing of its patient letter did not constitute a tortious interference

with the Practices' patients because of the lack of requisite malice, among other things.

7.      Theft of Intellectual Property, Breach of New Jersey Trade Secrets Act.  The

Respondents have alleged the Practice's patient list was confidential information in which it had a

protectable interest.  This argument has merit and would have been sufficient to support Restraints

that bound departing members if Restraints had been included in the Operating Agreements.  In

New Jersey a Restraint that goes beyond protecting a legitimate business interest such as

confidential information will not be enforced.  Restraints are strictly construed, and surely cannot

be implied.  The Operating Agreements are well drafted and comprehensive.  If the parties had

intended that post-departure solicitation of patients be prohibited, they would have so provided in

the Operating Agreements. Any contention that the Physician Claimants violated the Practice's intellectual property rights by obtaining and contacting the patients they had seen is without merit.

I also find that under the facts of this case the Practice's patient list was not a protectible trade secret. Respondents' counsel cited two out-of-state cases for the proposition that a medical practice's patient list was a trade secret but could find no New Jersey case that so held. One of these out-of-state cases involved two doctors seeking to purchase the medical practice of a third who, after a letter of intent was signed, decided to do an "end run" and get the practice for nothing. The factual background of the second case is not clear, but the opinion makes it clear that the plaintiff must (i) prove that but for the use of the patient data the patients would not have left the subject practice, and (ii) quantify damages. The Respondents have done neither.

8.    <u>Employee Solicitation and Poaching</u>. The Respondents allege that the Physician Claimants breached their duty of loyalty by acting contrary to the best interests of the Practice while still members. The evidence does not support these allegations with one exception – the solicitation of employees.

The Respondents agreed that four employees (Carlsson, Giordano, Nagamine, and Harding) could leave and work for AOG, but it appears that the Claimants did solicit at least some of the other four employees who joined them and made them employment offers prior to December 31, 2021. For example, although Dr. Wright testified that Claimants deliberately did <u>not</u> attempt to bring Colleen Joseph with them, the Claimants were setting up an email address for her in mid-December.

And although most of the administrative aspects of AOG's start-up were being handled by Carlos Curras, it appears that the Claimants were having at least some of these eight employees of the Practice, while still employed by the Practice, handle certain logistical and administrative matters for AOG.

The Respondents have not attempted to quantify any damages that flowed from these breaches, and it would have been difficult for them to do so. With respect to the "poaching" issue, the Respondents would have to prove that but for being solicited by AOG the subject employees would have remained employees of the Practice, and the Respondents would have to prove that the contracted Practice could support those employees. With respect to the issue regarding the handling of logistical and administrative matters, the Respondents would have to prove that but for these diversions the subject employees would have generated additional revenue for the Practice.

Although I am unable to award any actual damages on account of these breaches, there should be a consequence, and I am ordering that the Claimants forego their share of the Practice's profits from December 1 until December 31, which I estimate and fix at $530,000 ($7.625 million x 83.33%, with the product being divided by 12).

D. Payment of Damages.

1.      The Claimants' damages on account of EOY 2021 distributions, and the BAIT tax rebate shall be paid immediately, as shall the Respondents' damages on account of the Claimants' forgoing the Practice's profits for December 2021.

2.      The Claimant's damages on account of the Physician Claimants' interest in the Practice and payments due under the Deferred Compensation Agreements shall be paid as follows:

a. The first three (of five) installments, the first of which would have been payable within sixty (60) days of December 31, 2021, and the second and third of which would have been payable on December 31, 2022, and December 31, 2023, shall be payable immediately. Because the Respondents wrongfully withheld payment of all the Claimant's damages on account of the Physician Claimants' interest in the Practice and payments due under the Deferred Compensation

13

Agreements, they should not be permitted to take advantage of the Annual Cap set forth in Section 7.6 of the Operating Agreements with respect to these installments.

　　　　b.　The fourth and fifth installments (the "Deferred Amount") shall be payable pursuant to the terms of the Operating Agreements and the Deferred Compensation Agreements (i.e., on December 31, 2024, and December 31, 2025); provided, however, that interest shall be deemed to accrue on the Deferred Amount from January 1, 2024, at the applicable federal rate on such date (that is, 4.54%). Pursuant to the Operating Agreements and the Deferred Compensation Agreements, the Deferred Amount shall be evidenced by promissory notes. Such promissory notes shall be unsecured, shall not be personally guaranteed, and shall be subject to the annual cap set forth in Section 7.6 of the Operating Agreements.

The amounts due the Physician Claimants are summarized in the following table:

| Item | Total Amount due Physician Claimants | Due Currently | Deferred Amount |
|------|--------------------------------------|---------------|-----------------|
| EOY 2021 Distribution | $1,250,000 | $1,250,000 | |
| Buy-Out of Interest in Practice | $1,075,000 | $645,000 | $430,000 |
| Payments Under Deferred Compensation Agreements | $4,925,000 | $2,955,000 | $1,970,000 |
| BAIT Tax Rebate | $885,000 | $885,000 | |
| Forfeit of December 2021 Profit | ($530,000) | ($530,000) | |
| **Totals** | $7,605,000 | $5,205,000 | $2,400,000 |

This ruling is intended to resolve, and does resolve, all disputes that were raised or could have been raised in this arbitration. I am fully aware that future disputes may arise regarding the payment of the Deferred Amount and the application of the annual cap thereto. The possibility of

such future disputes is unavoidable, given the terms of the Operating Agreements and the Deferred

Compensation Agreements, which terms I am unwilling to rewrite.

Respectfully submitted,

IRA B MARCUS, Arbitrator

Dated:  February 19, 2024

# **<u>EXHIBIT D</u>**

**PREPARED BY THE COURT**

|  |  |
|---|---|
| ANTHONY FESTA, M.D., ANTHONY SCILLIA, M.D., CRAIG WRIGHT, M.D., JOHN CALLAGHAN, M.D., CASEY PIERCE, M.D., and ACADEMY ORTHOPAEDICS LLC,<br><br>          Plaintiffs,<br><br>v.<br><br>VINCENT MCINERNEY, M.D., NEW JERSEY ORTHOPAEDIC INSTITUTE LLC, and NORTHLANDS ORTHOPAEDIC INSTITUTE LLC,<br><br>          Defendant. | **SUPERIOR COURT OF NEW JERSEY PASSAIC COUNTY: CHANCERY DIVISION GENERAL EQUITY**<br><br>Docket No.:  PAS-C-26-24<br><br>CIVIL ACTION<br><br>**ORDER FOR JUDGMENT** |

**THIS MATTER**, having come before the Court by way of, Plaintiffs' Verified Complaint and Order to Show Cause seeking to confirm the American Health Law Association ("AHLA") Arbitration Award dated February 19, 2024, and entering judgment, and the court having considered the papers filed and the arguments of counsel, and for good cause shown

**IT IS** on this  23rd  day of  September  , 2024

**ORDERED** as follows:

1.  This court hereby confirms the arbitration award of The American Health Law Association ("AHLA") dated February 19, 2024 by Ira Marcus, Esq. in favor of the Plaintiffs in the amount of $7,605,000.00 pursuant to <u>N.J.S.A</u>. 2A:23B-22 as broken down in the AHLA Award as follows:

    a.  $5,205,000.00 to be paid immediately as follows:

        i.  EOY 2021 Distributions = $1,250,000.00

        ii.  Buy-Out of Interest in Practice = $645,000.00

1

       iii.   Payments Under Deferred Compensation Agreements = $2,955,000.00

       iv.   BAIT Tax Rebate = $885,000.001

    b.   $2,400,000.00 of deferred compensation to be paid out as follows:

       i.   Buy-Out of Interest in Practice = $430,000.00

       ii.   Payments Under Deferred Compensation Agreements = $1,970,000.00

2. Final Judgment is hereby entered in favor of the Plaintiffs against NJOI and NOI jointly and severally in the sum of $7,605,000.00 in accordance with the AHLA Award;

3. While these four items total $5,735,000.00 the actual amount is adjusted to $5,205,000 because the AHLA Award contains a $535,000 offset to be charged against the amounts owed to Plaintiffs.

4. Defendants shall provide to Plaintiffs full year-end financials as of December 31, 2023. This information shall include but not be limited to the 2023 annual general ledgers for NJOI/NOI, 2023 profit and loss statements for NJOI/NOI, 2023 balance sheets for NJOI/NOI and ending bank account balances for all NJOI/NOI bank accounts as of December 31, 2023.

5. Compelling Defendants to provide Plaintiffs with monthly financials from January 31, 2024, until the deferred compensation amounts in Paragraph 1(B) are paid. The monthly financials to be provided by Defendants shall include but not be limited to monthly general ledgers for NJOI/NOI, monthly profit and loss statements for NJOI/NOI, monthly balance sheets for NJOI/NOI, and the endi.ng monthly bank account balances for all NJOI/NOI bank accounts. The relevant information shall be provided from the following bank accounts of which Plaintiffs are aware of. To the extent there are any other accounts, Defendants must disclose same and provide the relevant information:

    a.   Wells Fargo account ending: 5179;

    b.   Wells Fargo account ending: 6698;

    c.   Wells Fargo account ending: 5229;

    d.   Wells Fargo account ending: 2324;

    e.   Valley National Bank account ending: 9931;

    f.   Any other business account in the name of NJOI or NOI from November 1, 2023 to present.

6.   The request to enjoin further distributions to Defendant McInernney is hereby denied.

7.   A copy of this Order shall be served by the Plaintiffs' attorney on all parties who have not been served electronically via eCourts, within 7 days of the date hereof.

/S/ Frank Covello
_____
HON. FRANK COVELLO, P.J.CH.

**SEE ATTACHED STATEMENT OF REASONS**

### FESTA V. MCINERNY
### DOCKET NO. C-26-24

### STATEMENT OF REASONS

This matter comes before the court by way of Plaintiffs Anthony Festa, Anthony Scillia, Craig Wright, John Callaghan, Casey Pierce, and Academy Orthopaedics LLC's ("Academy") application for judgment affirming the American Health Law Association ("AHLA") Arbitration Award dated February 19, 2024, and Defendants Vincent McInerney, New Jersey Orthopaedic Institute LLC ("NJOI"), and Northlands Orthopaedic Institute LLC's ("NOI") motion to vacate the Award and dismiss.

### PROCEDURAL HISTORY

This matter originated with Plaintiffs' application for an Order to Show Cause against Defendants on January 7, 2022, stemming from a dispute arising out of Plaintiffs' resignations from Defendant orthopedic surgery practices. Defendants moved to compel arbitration pursuant to the Operating Agreements of both entities, and this court dismissed the Complaint, ordered arbitration, and ordered that Defendants place $1,750,000 into escrow for the pendency of the litigation on May 5, 2022.

The parties began a ten-day AHLA arbitration on November 13, 2023. The Arbitrator issued a fifteen-page Award in favor of Plaintiffs on February 19, 2024. The Arbitrator awarded Plaintiffs $7,602,000.00 in aggregate, with $5,205,000 to be paid immediately and the remainder paid out over time as set forth in the applicable agreements. The Arbitrator held the Defendants jointly and severally liable.

On February 25, 2024, Defendants moved to clarify the Award and remove Defendant McInerny from being held liable. The Arbitrator subsequently modified his decision to be jointly

and severally liable only against Defendants NJOI and NOI. Plaintiffs filed this action seeking confirmation of the Award on March 6, 2024, after Defendants refused to remit payment required by the Award. Defendants move to vacate the Award.

### FACTS

The physician parties were equal owners in an orthopedic surgery practice originally founded by Defendant McInerney. The relationship between McInerney and Plaintiffs soured, and on August 17, 2021, Plaintiffs gave notice that they were going to leave the practice. On January 1, 2022, they left, opening Plaintiff Academy on the same floor as the practice.

At the arbitration hearing that began on November 13, 2023, the Arbitrator heard testimony from the parties and their experts about the proper amount due to Plaintiffs based on the value of the practice at the time of their departure and the terms of the practice's Operating Agreements. The Arbitrator, in his February 19, 2024, Award, determined that the Defendant owed the Plaintiffs an aggregate total of $7,605,000, representing the unpaid end-of-year distribution for 2021, the Plaintiffs' buy-out interest in the practice, payments under the Operating Agreements' Deferred Compensation Agreements, and a rebate for the Business Alternative Income Tax ("BAIT").

The Arbitrator ordered that of the total, $5,205,000 be paid immediately, with the remainder to be paid out pursuant to the Deferred Compensation Agreement. Included in the portion to be paid immediately were the Deferred Compensation payments that would have become payable at the end of the years 2021, 2022, and 2023, without adjustment for a contractual annual cap based on the practice's net incomes. The remaining payments would remain subject to the annual cap.

The Arbitrator determined that the BAIT refund represented a return of money the Plaintiffs had paid in taxes in prior years as members of the firm, and it was therefore "inappropriate to treat the right to this refund as an ordinary trade receivable." Arb. Award at § 4.

The Operating Agreements required a discount of the practice value when notice was less than six months, with a greater discount applied for shorter notice. The Arbitrator applied a 20% discount, the amount appropriate for notice between ninety days' and six months' notice.

## STANDARD OF REVIEW

New Jersey courts "have long noted our public policy that encourages the use of arbitration proceedings as an alternative forum." Wein v. Morris, 194 N.J. 364, 375–76 (2008) (citation and internal quotations omitted); see also N.J. Tpk. Auth. v. Local 196, I.F.P.T.E, 190 N.J. 283 (2007) ("[A]rbitration is meant to be a substitute for and not a springboard for litigation.") (citation and internal quotations omitted). Accordingly, our jurisprudence has developed a "strong preference for judicial confirmation of arbitration awards." Linden Bd. of Educ. v. Linden Educ. Ass'n ex rel Mizichko, 202 N.J. 268, 276 (2010) (quoting Middletown Twp. PBA Local 124 v. Twp. of Middletown, 193 N.J. 1, 10 (2007).

Because of the strong presumption of an arbitration award's validity, the heavy burden falls on its challenger to demonstrate statutory grounds to vacate. See Minkowitz v. Israeli, 433 N.J. Super. 111, 136 (App. Div. 2013). Under the Arbitration Act, a court may vacate an arbitration award only if:

(1) the award was procured by corruption, fraud or other undue means;

(2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to section 15 of this act, so as to substantially prejudice the rights of a party to the arbitrations proceeding;

(4) an arbitrator exceeded the arbitrator's powers;

[N.J.S.A. 2A:23B-23(a).]

<u>**ANALYSIS**</u>

## I.      The Arbitrator's Award

In their effort to vacate the Award, Defendants argue that the Arbitrator used "undue means" or exceeded his powers in ignoring the annual cap for the three outstanding years' payments, for excluding the BAIT refund as an asset in the book value of the practice, and for failing to set a 40% discount because Plaintiffs did not give notice to the date of departure until October, less than ninety days before actual departure.

"'Undue mean' ordinarily encompasses a situation in which the arbitrator has made an acknowledged mistake of fact or law or a mistake that is apparent on the face of the record." Borough of E. Rutherford v. E. Rutherford PBA Local 275, 213 N.J. 190, 203 (2013) (citation and internal quotations omitted). An arbitrator exceeds his authority when he ignores the terms of the parties' agreement. Ibid. Courts will generally accept an arbitrator's interpretation of the parties' agreement if it is "reasonably debatable." Office of Emp. Rels. v. Commc'ns Workers of Am., 154 N.J. 98, 112 (1998). Here, the Arbitrator's interpretation of the Operating Agreements was "reasonably debatable" as it related each of the issues raised by Defendants.

Under the "reasonably debatable" standard, if two or more interpretations of the underlying agreement can be plausibly argued, then the court cannot substitute its own judgment for that of the arbitrator. Borough of Carteret v. Firefighters Mut. Benevolent Ass'n, Local 67, 247 N.J. 202,

212 (2021). In <u>Borough of Carteret,</u> a contract provision that mentioned only "senior firefighters" could have been interpreted to exclude lieutenants, or to include any lieutenant acting as a captain. <u>Id.</u> at 212–13. The Court found that both positions were plausible interpretations of the contract and reinstated the arbitrator's award. <u>Id.</u> at 213.

Defendant first asserts that the Arbitrator rewrote the Operating Agreement provision when he decided not to apply the annual cap to the annual payments that had already become payable by the date of his Award. Section 7.6 of the Operating Agreements require that installment payments be capped at 10% of the practice's net incomes, with any remainder being deferred with interest as long as necessary. This 10% figure is to be arrived at by the practice's managers in consultation with the practice's accountant. The Arbitrator awarded the missed installments due immediately, not subject to the cap, because the Defendants wrongfully withheld payment during the pendency of the dispute. The Operating Agreement does not contemplate retroactive application of the cap for withheld payments. Defendants have presented no evidence of what percentage of the practice's net incomes the installment payments would have comprised in 2021, 2022, and 2023, so it was reasonable for the Arbitrator to conclude, combined with Defendants' willful default under the contract, that the payments did not exceed the cap and were due in full.

Defendant's argument that the Arbitrator rewrote the Operating Agreements by excluding the BAIT refund is similarly unavailing. New Jersey enacted the BAIT in 2020 to circumvent the federal state and local tax deduction limit. The BAIT refund consisted of tax money the practice members had paid individually in previous years and was not a typical account receivable. The Operating Agreement does not contemplate the BAIT refund because it did not exist until after the Plaintiffs had joined the practice, and it was reasonable for the Arbitrator to treat funds they paid to be directed back to them without having to be folded into the assets of the practice.

The Arbitrator's decision regarding the discount is a clear example of "reasonably debatable." The Arbitrator considered in his Award the two possible interpretations of the notice of departure provision in the Operating Agreements and determined that the lesser discount of 20% was appropriate because the practice had more than 90 days' notice because notice of Plaintiffs' resignation in August put Defendants on notice that the departure was approaching even if the actual date was not specified. Plaintiffs did in fact leave more than 90 days after their August notice; running the notice period from their resignation to their departure was a plausible interpretation of the Operating Agreements.

## II.    Plaintiffs' Request for an Accounting

Compelling an accounting is a well-established equitable remedy that may be pursued when legal remedies are unavailable. See Dairy Queen, Inc. v. Wood, 369 U.S.469, 478 (1962) ("The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is [] the absence of an adequate remedy at law.); see also Hon. William A. Dreier et al., Guidebook to Chancery Practice in New Jersey, § II.R (10th ed. 2018). An accounting creates disclosure and accountability, "and should allow the court and interested parties to understand a business' transactions and operation." Lee v. Telson Elec. U.S.A., Inc., BER-C-69-06, 2006 WL 1642209 (N.J. Super. Ct. Ch. Div. June 9, 2006).

Plaintiffs seek an order compelling accountings for the time since they left the practice, and for prospective monthly accounting to verify the applicability of the annual cap on future installment payments. Defendants correctly object to such an outcome, because confirmation of an arbitration award should reflect what would have happened had the parties immediately complied with the awards instead of going to court. Americas Ins. Co. v. Seagull Compania

Naviera, S.A., 774 F.2d 64, 67 (2d Cir. 1985). Therefore, no accounting will be necessary for past periods because the Defendants are obligated to comply with the Award and make immediate payment. Once reduced to judgment, the Award can be collected in post judgment discovery proceedings, if necessary.

However, the Award does not require immediate payment of the entire amount due. The installment payments pursuant to the Deferred Compensation Agreements span at least through December 2025, and longer still if the annual cap applies to a given payment. Without an accounting, Plaintiffs have no way to determine whether the application of the annual cap is warranted without expensive litigation and discovery. It is inequitable to force Plaintiffs to bring suit if they feel they are being shortchanged, which may be a reasonable fear based on Defendants' prior conduct. Thus, annual accountings going forward are required.

Plaintiffs, who should be receiving annual installments, only need annual accountings to ensure the amounts paid by Defendants are proper. Defendants are correct in their assertion that were they to comply with the Award as written, financial statements would be unnecessary. The Award fixed the final installments at $1.2 million each plus interest. Accounting is only necessary if Defendants remit less than the full amount due, no financial disclosures are needed to justify a payment that conforms with the regular installment schedule.

### III.    Plaintiffs' Request for Injunctive Relief

Plaintiffs ask the court to enjoin Defendants from making any payment outside the ordinary course of business—especially to McInerney—to prevent Defendants from transferring assets away from the practice to avoid payment by lowering the annual cap.

Equitable relief in the form of a permanent injunction is an extraordinary remedy. "A permanent injunction requires proof that the applicant's legal right to such relief has been established and that the injunction is necessary to prevent a continuing, irreparable injury." Verna v. Links at Valleybrook Neighborhood Ass'n, 371 N.J. Super 77, 89 (App. Div. 2004). Whether a permanent injunction should be granted is within the sound discretion of the trial court. Sheppard v. Twp. of Frankford, 261 N.J. Super. 5, 9 (App. Div. 1992). Such relief must not be more extensive than is reasonably required to protect the prevailing party's interests. Verna, 371 N.J. Super. at 89 (citing Sunbeam Corp. v. Windsor-Fifth Ave., 14 N.J. 222, 232-33 (1954)).

Plaintiffs have not shown a right to enjoin Defendants from taking any distributions from the practice and such an injunction would be far more extensive than necessary to protect their interests. Plaintiffs quote Peters v. Pub. Serv. Corp., 132 N.J. Eq. 500, 512 (Ch. Div. 1942), to argue that equitable relief should be granted "when maintenance of the status quo will result in no material damage" to Defendants' rights or the harm "will be comparatively slight." Preventing McInerney from being paid from practice funds for—at minimum—over a year is not a "comparatively slight" injury compared to the possibility that he may seek to avoid complying with the confirmed Award. "Net Cash Flow" in the language of the annual cap provision has a specific definition in the Operating Agreements, which excludes distributions to members other than the base compensation draw. When each remaining installment comes due, any inconsistencies in the net cash flows to which the annual cap applies will be evident in the accounting. Thus, no injunction is appropriate.

## CONCLUSION

For the foregoing reasons, Plaintiffs' application is GRANTED in part, and Defendants' Motion to Vacate and Dismiss is DENIED.

# **<u>EXHIBIT E</u>**

Kinga Skalska-Dybas
9/13/2023

76

1    remember exactly.

2           Q.    120,000?

3           A.    Uh-hum.

4           Q.    Did you get a raise for 2022 in

5    salary?

6           A.    Yes.

7           Q.    Did you get a raise in 2023?

8           A.    Not yet.

9           Q.    Not yet.

10          A.    We have always employees at the end of

11   the year, usually happens December of each year.

12          Q.    What about in your job as practice

13   administrator, part of the duties as practice

14   administrator, you oversee all of the employees of

15   the practice, right?

16          A.    Correct.

17          Q.    And Mrs. McInerney is an employee of

18   the practice, right?

19          A.    Correct.

20          Q.    Do you know how much she is paid?

21          A.    Yes.

22          Q.    How much?

23          A.    124,000.

24          Q.    124,000?

25          A.    Yes.

Kinga Skalska-Dybas
9/13/2023

1          Q.     Are you sure it's not more than that?

2          A.     **Let's say I believe it's 124,000, and**

3    **it was like this every year, if I'm not mistaken.**

4          Q.     So she gets paid more than you?

5          A.     **No.**

6          Q.     In 2021 she got paid more than you if

7    you made 120 and she made 124,000, right?

8          A.     **Possibly.  As I said, I think I made**

9    **approximately 124,000, but it could be a bit more, I**

10   **don't remember.**

11         Q.     No, you said you made for the 2021,

12   120?

13         A.     **It's around that number.  I don't**

14   **remember exactly.**

15         Q.     What does Mrs. McInerney do for the

16   practice, what are her responsibilities?

17         A.     **When, currently?**

18         Q.     2021.

19         A.     **In 2021, she was mostly administrative**

20   **assistant to Dr. McInerney.**

21         Q.     How many hours a week did she work?

22         A.     **I don't know.**

23         Q.     40 hours a week?

24                MR. SILBERBERG:  Objection to form.

25   BY MR. DeMARTINO:

Kinga Skalska-Dybas
9/13/2023

78

1          **A.      I don't know.**

2          Q.      Less than 40 hours a week?

3          MR. SILBERBERG:  Objection to form.

4          **A.      I don't know.**

5          Q.      One of the things that you do as the

6    chief financial officer is you, I think you handle

7    payroll, right?

8          **A.      Correct.**

9          Q.      So if Mrs. McInerney is an employee of

10   the practice, she submits her time card, right?

11         **A.      She is not hourly employee.**

12         MR. SILBERBERG: Objection to form.

13   BY MR. DeMARTINO:

14         Q.      She's not an hourly employee?

15         **A.      Correct.**

16         Q.      She's a salary employee?

17         **A.      Correct.**

18         Q.      Fair enough.

19         What days does she come into the

20   office, is she there five days a week?

21         MR. SILBERBERG: Objection to form.

22   BY MR. DeMARTINO:

23         **A.      No.**

24         Q.      How many days a week in 2021?

25         MR. SILBERBERG:  Objection to form.

Kinga Skalska-Dybas
9/13/2023

79

1          A.      I don't remember, she was coming not
2    often, on occasion.   She mostly worked from home.
3          Q.      She worked from home?
4          A.      Yes.
5          Q.      Was anyone else allowed to work from
6    home?
7          A.      Yes.
8          Q.      In 2021?
9          A.      Yes.
10          Q.      And who approved allowing people to
11    work from home, was that you that approved that?
12          A.      No.
13          Q.      Who approves that?
14          A.      Physician claimants approved some
15    employees to work from home.
16          Q.      But they wouldn't approve Mrs.
17    McInerney working from home, right?
18          A.      They didn't -- they didn't object her
19    working from home; I never received any complaints in
20    that regard.
21          Q.      And those complaints would've gone to
22    you?
23          A.      Yes.
24          Q.      Not to Dr. McInerney?
25          A.      I believe that would go to me.

Kinga Skalska-Dybas
9/13/2023

240

```
 1          A.      No.
 2          Q.      Who controls the N.J.O.I. website?
 3          A.      For the longest time, the website was
 4     controlled by Dr. Scillia.
 5          Q.      Dr. Scillia?
 6          A.      Yes.
 7          Q.      What about the social media pages of
 8     N.J.O.I., and I'm talking about now, I'm talking
 9     about after January 2022, who controls the social
10     media pages of the practice?
11          A.      We have a marketing person that we
12     have on the staff, and we have -- we cooperate with
13     our website company as well as third-party vendor.
14          Q.      So social media, who is the marketing
15     employee?
16          A.      Laurel McInerey.
17          Q.      What was her name?
18          A.      Laurel.
19          Q.      And she's related to Dr. McInerney?
20          A.      Yes.
21          Q.      Daughter?
22          A.      Yes.
23          Q.      How long has she worked at the
24     practice?
25          A.      Over a year, year and a half maybe, I
```

Kinga Skalska-Dybas
9/13/2023

241

1   **don't remember exactly.**

2           Q.      So she started after the claimants

3   left?

4           **A.      Yes.**

5           Q.      Some time after January 2022?

6           **A.      Yes.**

7           Q.      How much is she paid a year?

8           **A.      I think around between 45 and 50,000.**

9           Q.      A year?

10          **A.      Yes.**

11          Q.      So she controls the social media of

12  the practice?

13          **A.      Partially, yes.**

14          Q.      Who else would be it other than her?

15          **A.      We have website company and we have**

16  **had third-party company, it's called So Clients.**

17          Q.      Who presses publish on posts that are

18  broadcasted out into the internet on behalf of the

19  practice?

20                  MR. SILBERBERG:  Objection to form.

21  BY MR. DeMARTINO:

22          **A.      All those three.**

23          Q.      So either the website company, Laurel

24  McInerney and who was the third?

25          **A.      And So Clients.  And just not long**